## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ICENY USA, LLC
8600 16th Street
Silver Spring, MD   20910

         Plaintiff,

    v.

M&M'S, LLC
c/o Marvin Castro Mondragon,
Registered Agent
11440 E 26th Lane
Yuma, AZ   85367

MARVIN CASTRO MONDRAGON
11440 E 26th Lane
Yuma, AZ   85367

   and

GABRIEL EUGENE PICO
2681 S. Virginia Dr. Apt. 16
Yuma, AZ   85364

        Defendants.

Civil Action No. <u>8:19-cv-2418</u>

## COMPLAINT

### I.     PRELIMINARY STATEMENT

1.    The plaintiff ICENY, LLC ("ICENY") has developed a system for the establishment and operation of contemporary ice cream shops featuring Thai style smashed and rolled ice cream products.  ICENY franchises this concept in the United States under its federally registered mark "I-CE-NY."  Thai rolled ice cream fairly new tothe United States, and ICENY is at the forefront of the development of this business.

2.     The defendant M&M's, LLC ("MM") entered into an I-CE-NY Franchise Agreement, and opened an I-CE-NY Thai ice cream shop in Yuma, Arizona in January 2019.  By April, however, MM ceased paying royalties to ICENY, but continued operating its shop using ICENY's confidential recipes and processes that MM had learned from ICENY.

3.     Since April, MM and its principals – the defendants Marvin Castro Mondragon ("Castro") and Gabriel Eugene Pico ("Pico") – have engaged in a pattern of attempted subterfuge and false statements that has irreparably injured ICENY.  Despite representing that they have stopped operating, the defendants are continuing operations and are now advertising that they are franchising their own Thai ice cream shop concept – which is in fact the concept that they learned from ICENY, contracted to operate as an I-CE-NY franchisee for the next ten years, and are now attempting to misappropriate for themselves.

4.     ICENY requires immediate relief from the Court, in the form of a temporary restraining order, a preliminary injunction, and a permanent injunction requiring the defendants to cease their operation of a Thai ice cream shop using ICENY's secret and confidential recipes and systems, and its I-CE-NY mark.  The defendants' conduct is causing irreparable harm to ICENY and the goodwill of the I-CE-NY system.  In addition, ICENY seeks to recover its damages, including its attorneys' fees, as a result of the defendants' breaches of contract, misappropriation, and unfair competition.

## II.    THE PARTIES

5.     ICENY is a Maryland limited liability company with its principal place of business in Silver Spring, Maryland.  ICENY's members are citizens of Maryland.

6.     The defendant MM is an Arizona limited liability company with its principal place of business in Yuma, Arizona.

7.     The defendants Castro and Pico are citizens of Arizona.

### III.   JURISDICTION AND VENUE

8.     This is a civil action arising under the Lanham Act, 15 U.S.C. § 1051 et seq., and the contracts between the parties.

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338, 1367, and 2201-02 and 15 U.S.C. §§ 1116 and 1121.

### IV.   THE I-CE-NY BRAND AND SYSTEM

10.     Thai ice rolls are new to the United States.  I-CE-NY shops prepare ice cream rolls to the customer's order, and customers enjoy the experience of watching their ice cream being made while they wait.  The shop employee pours flavored milk-based liquid on to a very cold metal surface, commonly referred to as an "anti-griddle."  As the base freezes, the employee manipulates it with small paddles (sometimes mixing in fruit, candy, or other flavorings), then spreads it out across the cold surface.  Once the base, now frozen into ice cream, covers the surface of the anti-griddle, the employee pushes a spatula across it and turns strips of it into rolls.  The employee then adds toppings ordered by the customer, often using the special combinations advertised in the shop.

11.     ICENY teaches its franchisees how to make these distinctive Thai ice cream rolls and provides franchisees with its secret, proprietary recipes for the preparation of I-CE-NY ice cream.  ICENY also provides franchises with training in the management and operation of I-CE-NY ice cream shops; with a distinctive exterior and interior design décor, color scheme, fixtures and furnishings for I-CE-NY ice cream shops; with standards and specifications for ingredients, food preparation, equipment, supplies, and restaurant operations; with copyrighted written materials; and with advertising and promotional programs.

## V.   THE FRANCHISE AGREEMENT BETWEEN THE PARTIES

### A.   The Grant of Franchise Rights

12.   Effective July 13, 2018, ICENY and MM entered into a Franchise Agreement (the "Franchise Agreement") pursuant to which MM was authorized to use the I-CE-NY Marks and System to operate an I-CEN-Y ice cream shop.   A true and correct copy of the Franchise Agreement accompanies this Complaint as Exhibit 1.

13.   Pursuant to Section 2.1 and Exhibit A of the Franchise Agreement, unless earlier terminated, MM was authorized and obligated to operate an ice cream shop using the I-CE-NY Marks and System (the "Franchised Business") for a term of ten (10) years at a location to be approved by I-CE-NY.  That location was subsequently determined to be 1979 E. 16th Street, Suite SB-7, Yuma, Arizona 85366 (the "Premises").

### B.   The Payment Obligations

14.   Pursuant to Section 4 of the Franchise Agreement, as amended by the attached Addendum to Franchise Agreement, MM had certain payment obligations to ICENY, as follows:

   a.   MM was obligated to pay an Initial Franchise Fee, payable $7,000 on execution, $6,000 sixty (60) days after the opening of the Franchised Business, $6,000 one hundred eighty (180) days after the opening of the Franchised Business, and $6,000 two hundred seventy (270) days after the opening of the Franchised Business.

   b.   MM was obligated to pay a weekly royalty of 4% of Net Sales (as defined in the Franchise Agreement).

   c.   MM was obligated to pay a weekly Brand Fund fee of 2% of Net Sales.

15.   Pursuant to Section 4.7, MM was required to pay interest on past due amounts in the amount of 1.5% per month.

C.      **The Restrictions On Disclosure of Confidential Information**

16.     In Section 15.1.1 of the Franchise Agreement, MM acknowledged that the I-CE-NY System "includes trade secrets and confidential and proprietary information and know-how that gives [ICENY] a competitive advantage," that "all material now or hereafter provided or disclosed to [MM] regarding the System is disclosed in confidence," and that "[MM's] use or duplication of the System or any part of the System in any other business . . . would constitute an unfair method of competition, for which [ICENY] would be entitled to all legal and equitable remedies, including injunctive relief, without posting a bond."

17.     In Section 15.2.2, MM agreed that it would not, during the term of the Franchise Agreement or for one year following termination:

> Own, maintain, operate, engage in, grant a franchise to, advise, help.
> . . or have any interest in, either directly or indirectly, any
> "**Competing Business**", which is defined as:   (1) a restaurant
> business that offers as a core menu item ice cream, frozen yogurt,
> cakes, pies, smoothies, shakes, specialty beverages, frozen dessert
> products, or any menu item that constitutes fifteen percent (15%) of
> sales at I-CE-NY shops; or (2) whose method of operation or trade
> dress is similar to that employed by the System.  During the term of
> this Agreement, there is no geographical limitation on this
> restriction.  Following the expiration, transfer or termination of this
> Agreement, this restriction shall apply to any Competing Business
> located within a five (5) mile radius of the Premises and any
> Competing Business located within a five (5) mile radius of any
> then-existing I-CE-NY shop; . . . "

18.     In Section 15.2.3. MM agreed:

> that the Premises will itself acquire goodwill associated with the
> System and that it would be difficult for us to ascertain that you have
> no interest in the operation by a third party of a restaurant concept
> at that location that would, if operated by you, violate the restrictions
> of this Section 15.2.  Accordingly, you further covenant and agree
> that, during the term of this Agreement and for a period of one (1)
> years following the transfer, expiration or earlier termination of this
> Agreement, you shall not, either directly or indirectly, for yourself,

> or through, on behalf of, or in conjunction with any person, firm, partnership, corporation, or other entity, sell, assign, lease or transfer the Premises to any person, firm, partnership, corporation, or other entity which you know, or have reason to know, intends to operate a restaurant business at the Premises that would violate Section 15.2.2.1 if operated by you. . .

19.     In Section 15.4, MM agreed that its owners – Castro and Pico – were bound personally by the provisions of Section 15.

20.     Castro and Pico also signed personal guarantees of MM's obligations in which they specifically agreed to be "personally bound by the covenants and restrictions contained in Section 15 (Covenants) of the Agreement."

21.     In Section 15.5.3, MM agreed that "violation of the terms of this Section 15 would result in irreparable injury to [ICENY] . . . and [MM] accordingly consent[s] to the issuance of an injunction prohibiting any conduct by [MM] in violation of Section 15."

**D.      The Restrictions On Transfer**

22.     In Section 16.2, MM agreed that it would not transfer any interest in the Franchise Agreement, or substantially all the assets of the Franchised Business without ICENY's written consent.

23.     Section 16.3 grants ICENY a right of first refusal to match any proposed transfer of the Franchise Agreement or Franchised Business.

**E.      ICENY's Termination Rights**

24.     Pursuant to Section 19.2, ICENY may terminate the Franchise Agreement without opportunity to cure if (1) MM fails to operate the franchised business for three consecutive days, (2) MM transfers the business without ICENY's consent, (3) MM breaches any covenant contained in Section 15, or (4) MM or its principal misuses the I-CE-NY marks.

25.     Pursuant to the Section 19.4, ICENY may terminate the Franchise Agreement if MM fails to cure any material breach within thirty (30) days after written notice.

26.     Section 20 of the Franchise Agreement sets forth MM's obligations on termination of the Franchise Agreement.  These included, without limitation:

      a.      ceasing to operate the Franchise Business;

      b.      ceasing "to use the confidential methods, procedures, and techniques associated with the System, the "I-CE-NY" name and mark, all other Proprietary Marks. . . ";

      c.      paying all sums due to ICENY; and

      d.      continuing to abide by the covenants contained in Section 15.

27.     Section 20.3 requires MM to pay liquidated damages on termination in the amount of the average weekly Royalty Fees and Brand Fund contributions over the lesser of fifty-two (52) weeks and period the business was open, multiplied by the lesser for 208 weeks and the number of weeks remaining in the term.

28.     Section 20.4 requires MM to pay ICENY "all damages, costs, and expenses (including, but not limited to, reasonable attorneys' fees) we incur in obtaining injunctive, declaratory, or other relief. . . ".

**VI.     MM'S CESSATION OF OPERATION OF THE FRANCHISED BUSINESS
AFTER LESS THAN FOUR MONTHS AFTER OPENING,
AND ITS FRAUDULENT OPERATION OF A COMPETING BUSINESS**

29.     MM opened its I-CE-NY business at the Premises in Yuma, Arizona in January 2019.

30.     On information and belief, MM's I-CE-NY shop was the first Thai ice cream shop in the Yuma, Arizona area.

31.     Neither Castro nor Pico had any prior experience in the ice cream business, or the Thai ice cream business.  Castro and his fiancée were trained by ICENY in the preparation of Thai ice cream rolls in accordance with ICENY's secret recipes and procedures and the I-CE-NY System.

32.     MM's I-CE-NY shop did good business and had strong sales.

33.     In early April 2019, Castro contacted ICENY's Director of Operations, Teeradej Naruenartwanich (known as "Danny"), to ask if Danny could meet MM's landlord in Los Angeles to review some issues regarding MM's lease.  Danny thereafter received text messages from a person named Jessi, who purported to be the landlord of the Premises.  Danny and Jessi arranged to meet at a mall in Los Angeles on April 10, 2019.  Danny met with Jessi on April 10, 2019, and Jessi requested that Danny sign a guarantee of the lease.  Danny advised Jessi that he could not sign an agreement he had never seen, and asked Jessi to send him the document by email.  Jessi never sent any agreement to Danny or ICENY.

34.     Thereafter, on April 12, 2019, without any prior notice or warning, MM ceased communicating with ICENY, stopped reporting sales, and ceased paying Royalty fees and making Brand Fund contributions.  I-CE-NY attempted to contact MM and Castro on multiple occasions in May and June but received no substantive response.  MM also failed to pay the remaining installments of its initial franchisee fee, in the amount of $18,000.

35.     On June 23, 2019, Danny went to Yuma and to meet with Castro at the Franchised Business to discuss the failure to communicate, report sales, or pay fees.  Danny discovered that Castro had begun replacing the I-CE-NY branding at the Premises with a new brand, PARAD-ICE CREAM ROLS.  However, the exterior signage affixed to the building displayed the I-CE-NY

name and logo.  The business was selling the same ice cream items that MM had sold at the Franchised Business, only with different names.

36.     Danny informed Castro that his and MM's conduct was unacceptable and that the operation of a Thai ice cream roll shop at the Premises was a breach of the Franchise Agreement and a misappropriation of the I-CE-NY System.  Castro stated that he had turned over the business to a third party, and that he no longer was involved with the business.

37.     At no time during Danny's meeting with Castro in June 2019 did Castro mention a "Mutual Termination and Release Agreement" or otherwise state that ICENY had agreed with MM to terminate the Franchise Agreement.

38.     At no time during Danny's meeting with Castro in June 2019 did Castro mention having paid Danny or ICENY $15,000 in cash in April 2019.

39.     The June 23, 2019 meeting lasted approximately forty-five (45) minutes.

40.     While in Yuma after the June 23, 2019 meeting, Danny again visited the Premises and saw both Castro and his fiancé working at the shop.  The exterior I-CE-NY sign was still being displayed.  The interior of the shop displayed the name PARAD-ICE CREAM ROLLS, but continued to use cups and supplies bearing the I-CE-NY name and mark.  The interior of the shop continued to use and display the I-CE-NY décor and furnishings.  The shop was still featuring Thai ice cream rolls, made in accordance with ICENY's secret recipes and procedures by Castro and his fiancé, who had learned them from ICENY.

41.     On June 28, 2019,  ICENY, by counsel, sent MM and Castro a Notice of Default and Termination (the "Notice").  A copy of the Notice is Exhibit 2.

42.     The Notice sets forth the immediate termination of the Franchise Agreement on nine separate bases, as enumerated on pages 2 and 3 of the Notice.  The Notice demands that MM

comply with the post-term obligations in the Franchise Agreement, including ceasing to operate, ceasing to use the I-CE-NY Marks, ceasing to use ICENY's confidential and proprietary recipes and procedures, and complying with its covenant not to compete.  The Notice also demands payment of the post-due royalties and early termination damages.

43.     In response to the Notice, the former counsel for MM, Jon D. Schneider, contacted counsel for ICENY.  Following that conversation, Schneider sent ICENY's counsel an email dated July 2, 2019, in which he attached both a "Mutual Termination and Release Agreement" and a June 19, 2019 letter that Schneider had sent to ICENY's president, Apisat Sutthisophaarporn (known as "Oak").  The document that purported to be a "Mutual Termination and Release Agreement," was dated April 10, 2019.  That document purports to terminate the "I-CE-NY Franchise Agreement dated 4/10/19;" purports to contain certain post-termination requirements and waive the remainder; purports to require and acknowledge a payment of $15,000 in cash, as a complete settlement of all financial obligations; and purports to release all claims between the parties.

44.     The "Mutual Termination and Release Agreement" purports to contain Danny's signature on behalf of ICENY.

45.     Danny did not sign the "Mutual Termination and Release Agreement"."

46.     The "Mutual Termination and Release Agreement" is not the document that Jessi asked Danny to sign at the April 10, 2019 meeting.

47.     ICENY was not aware of and had never seen, the "Mutual Termination and Release Agreement" prior to ICENY's counsel receiving it on July 2, 2019, as ICENY has no record of the June 19, 2019 letter from Mr. Schneider.

48.     The "Mutual Termination and Release Agreement" contains a notary line under the signature lines.  The notary line is not filled in or executed.

49.     There is no "I-CE-NY Franchise Agreement dated 4/10/19."

50.     On information and belief, Danny's signature on the "Mutual Termination and Release Agreement" is a forgery.

51.     After subsequent discussions between Mr. Schneider and ICENY's counsel, in an email dated July 9, 2019, ICENY's counsel informed Mr. Schneider that ICENY had never seen the "Mutual Termination and Release Agreement," and believed it to be a forgery.

52.     Subsequently, on July 15, 2019, Mr. Schneider notified ICENY's counsel that Castro and MM had retained new counsel to advise them going forward, Leonard Sominsky, and provided Mr. Sominsky's contact information.

53.     After leaving several messages, ICENY's counsel finally reached Mr. Sominsky on July 24, 2019.  Mr. Sominsky advised that he had been retained to file a Chapter 7 bankruptcy proceeding on behalf of Castro.

54.     During that discussion, ICENY's counsel advised Mr. Sominsky that MM and Castro were continuing to use the I-CE-NY name and marks in connection with the operation of the shop at the Premises and in marketing the new business online and in social media.  Mr. Sominsky represented that he would advise Castro to cease this conduct.

55.     Despite that fact, (a) the I-CE-NY Marks and names continued to be used at the Premises, including, on information and belief, the exterior signage, interior décor, and branded cups; (b) the I-CE-NY Marks and names continued to be used on the PARAD-ICE Yuma Facebook page, along with proprietary promotional materials provided to Castro by ICENY; (c) the I-CE-NY Marks and name, and proprietary promotional materials, continued to be used on the PARAD-

ICE Yuma Instagram account; and (d) the I-CE-NY Marks and name, and proprietary promotional materials, continued to be used on the PARAD-ICE Yuma Yelp page.

56.     ICENY's counsel brought the facts concerning the continuing use of ICENY's Marks and proprietary materials to the attention of Mr. Sominksy by email on July 29, 2019. Sominsky responded on July 30, 2019, again, that he intended to file a Chapter 7 bankruptcy for Castro personally, and that "Castro has surrendered the store he once operated as [ICENY's] franchisee to his landlord, and he assured me he is not operating any business out of that location or any location."

57.     ICENY's counsel then contacted the landlord of the Premises.  The landlord left counsel a voicemail stating that the Premises had not been surrendered, and that MM and Castro were still the tenants.  Counsel forwarded that voicemail message to Mr. Sominsky by email on July 31, 2019.

58.     On August 1, 2019, Sominsky responded by email, stating that after further consultation with Castro, he had been told that Castro had "handed over the keys to his manager Mr. Gabriel Pico" and that "Mr. Pico continued to operate the store and apparently has not informed the landlord or ICENY about this change of control."

59.     Pico executed a personal guarantee of the Franchise Agreement.

60.     Pico agreed to be personally bound by the provisions of the Franchise Agreement, specifically including the covenants against competition in Section 15 of the Franchise Agreement.

61.     On August 19, 2019, ICENY received a letter from the landlord of the Premises stating that MM was still in possession of the Premises but wished to transfer  the lease to another entity.

62.     As of the filing of this Complaint, MM had not filed for bankruptcy.

## COUNT ONE

### (Declaratory Judgment:  Termination of the Franchise Agreement)

63.     ICENY realleges every other paragraph of this Complaint.

64.     In the June 28, 2019, Notice, ICENY provided MM with written notice of its default and of provisions of the Franchise Agreement that permitted immediate termination of the Franchise Agreement.

65.     The Franchise Agreement terminated effective June 28, 2019.

66.     Pursuant to 28 U.S.C. §§ 2201 and 2202, ICENY seeks a declaratory judgment that the Franchise Agreement has validly terminated in accordance with the provisions of that Agreement.

## COUNT TWO

### (Declaratory Judgment – Invalidity of the "Mutual Termination and Release Agreement")

67.     ICENY realleges every other paragraph of this Complaint.

68.     MM and Castro have asserted that the "Mutual Termination and Release Agreement" is valid and binding.

69.     The "Mutual Termination and Release Agreement" was never executed by ICENY and is a forgery.

70.     An actual and justifiable controversy exists regarding the validity and enforceability of the "Mutual Termination and Release Agreement."

71.     Pursuant to 28 U.S.C. §§ 2201 and 2202, ICENY seeks a declaratory judgment that the "Mutual Termination and Release Agreement is invalid and unenforceable.

## COUNT THREE

### (Breach of Contract – Franchise Agreement)

72.     ICENY realleges every other paragraph of this Complaint.

73.     MM's failure to pay its initial franchise fees, royalty fees, and interest on past due amounts constitutes a breach of the Franchise Agreement.

74.     ICENY has been damaged by MM's breach of the Franchise Agreement in an amount to be proved at trial.

## COUNT FOUR

### (Breach of Contract - Post-Termination Obligations)

75.     ICENY realleges every other paragraph of this Complaint.

76.     Despite the valid termination of the Franchise Agreement, MM has failed to close and de-identify the Thai ice cream roll shop at the Premises.  Instead, MM has continued to operate a Thai ice cream roll shop utilizing the I-CE-NY Marks, I-CE-NY System, including without limitation, the I-CE-NY confidential recipes and procedures in a manner likely to cause confusion or to deceive and which falsely suggests an association or connection with ICENY, all in breach of Section 20 of the Franchise Agreement.

77.     MM has also breached the Section 20 of the Franchise Agreement by continuing to use signage, slogans, marketing materials, and other materials displaying, associated with or provided by ICENY.

78.     MM has also breached Section 20 of the Franchise Agreement by using and failing to return ICENY's confidential information, including the ICENY Manual after termination of the Franchise Agreement.

79.     MM has also breached Section 20 of the Franchise Agreement by using a colorable imitation of the I-CE-NY Marks in connection with the operation of a Thai ice cream roll business at the Premises.

80.     To the extent that the "Mutual Termination and Release Agreement" is held valid and enforceable (which ICENY denies), MM's conduct is in breach of that agreement as well.

81.     The conduct set forth herein has caused and continues to cause irreparable harm and damage to ICENY and the I-CE-NY system.

82.     In addition, ICENY has sustained actual damages, costs, and attorneys' fees as a result of MM's breach of the contractual post-termination obligations in an amount that has yet to be determined.

## COUNT FIVE

### (Breach of Contract – Lost Future Royalties)

83.     ICENY realleges every other paragraph of this Complaint.

84.     As a result of MM's default of its payment obligations under the Franchise Agreement and the termination of the Franchise Agreement, MM is in breach of its obligation to pay ICENY royalties for the full term of the Franchise Agreement and is obligated to pay the early termination damages provided for in the Franchise Agreement.

85.     ICENY has been damaged by MM's breach of the Franchise Agreement in an amount to be proved at trial.

## COUNT SIX

### (Breach of Contract – Post-Termination Covenant Not To Compete)

86.     ICENY realleges every other paragraph of this Complaint.

87.     In Section 15.2 of the Franchise Agreement, MM agreed not to operate an ice cream shop at the Premises, among other places, for a period of one (1) year after termination of the Franchise Agreement.  The restrictions contained in Section 15.2 are reasonable.

88.     MM, Castro and Pico are continuing to operate an ice cream shop at the Premises after the termination of the Franchise Agreement.  The ice cream shop being operated at the Premises is a direct copy of an I-CE-NY shop.

89.     The conduct set forth herein has caused and continues to cause irreparable harm and damage to ICENY and the I-CE-NY System.

90.     In addition, ICENY has sustained actual damages, costs and attorneys' fees as a result of MM's breach of the covenant against competition.

## COUNT SEVEN

**(Trademark, Service Mark and Trade Dress Infringement)**

91.     ICENY realleges every other paragraph of this Complaint.

92.     MM's, Castro's and Pico's use of the I-CE-NY Marks and marks confusingly similar to the I-CE-NY Marks without authorization or license from ICENY is likely to cause confusion in the public mind concerning the source, affiliation, or sponsorship of goods and services being offered under the I-CE-NY Marks.

93.     Consumers are likely to believe, contrary to fact, that MM, Castro and Pico are authorized franchisees of the I-CE-NY System; that the ice cream shop at the Premises is a legitimate ICENY shop; and that the services being offered by MM, Castro and Pico are sponsored or authorized by the ICENY.

94.     MM, Castro and Pico are willfully, intentionally, and knowingly using trademarks, service marks, trade dress and designations that are identical to, substantially indistinguishable

from, or confusingly similar to the I-CE-NY Marks in violation of section 32 of the Lanham Act, 15 U.S.C. § 1114.

95.     To the extent they are not directly infringing, MM, Castro and Pico are liable as contributory infringers in violation of the Lanham Act.

96.     The defendants' conduct is causing irreparable injury to ICENY's reputation and goodwill, which will continue unabated unless enjoined by this Court.

97.     In addition, the defendants' conduct is causing monetary damage to ICENY in an amount to be proved at trial.

## **COUNT EIGHT**

### **(Federal Unfair Competition)**

98.     ICENY realleges every other paragraph of this Complaint.

99.     The defendants' unauthorized use of the I-CE-NY Marks and trade dress, marks confusingly similar to the I-CE-NY Marks, and other marks, slogans, décor, materials and designations of origin identifying I-CE-NY shops holding themselves out as duly licensed ICENY franchisees, and representing to the public that they are providing services authorized by the I-CE-NY System constitute false designation of origin, false advertising, false or misleading descriptions of fact, and false or misleading representations of fact, which are likely to cause confusion or mistake, or to deceive as to the affiliation, connection, or association between the defendants and the I-CE-NY System, or as to the origin, sponsorship, or approval of the goods or services being offered by the defendants, or as to ICENY's approval of the defendants' commercial activities.

100.     The defendants' conduct violates section 43(a) of the Lanham Act, 15 U.S.C. § 1125 (a).

101.    The defendants' conduct is causing irreparable injury to ICENY's reputation and goodwill, which will continue unabated unless enjoined by this Court.

102.    In addition, the defendants' conduct is causing monetary damage to ICENY, in an amount to be proven at trial.

**COUNT NINE**

**(State Law, Trademark and Service Mark Infringement)**

103.    ICENY realleges every other paragraph of this Complaint.

104.    The I-CE-NY Marks are distinctive and have developed a secondary meaning in the public mind in that consumers have come to know and recognize the I-CE-NY Marks as identifying the services offered in the I-CE-NY System.

105.    The public is likely to be confused, deceived, or otherwise manipulated by the defendants' unauthorized use of the I-CE-NY Marks and marks confusingly similar to them. Therefore, the defendants' use of the I-CE-NY Marks without right, license, or authorization constitutes trademark and service mark infringement under the laws of Maryland and Arizona.

106.    The defendants' conduct is causing irreparable injury to ICENY's reputation and goodwill, which will continue unabated unless enjoined by this Court.

107.    In addition, the defendants' conduct is causing monetary damage to ICENY, in an amount to be proven at trial.

**COUNT TEN**

**(State Law Unfair Competition)**

108.    ICENY realleges every other paragraph of this Complaint.

109.    The defendants' conduct constitutes unfair competition under applicable state law.

110.     The defendants' conduct is causing irreparable injury to ICENY's reputation and goodwill, which will continue unabated unless enjoined by this Court.

111.     In addition, the defendants' conduct is causing monetary damage to ICENY, in an amount to be proven at trial.

## COUNT ELEVEN

### (Unjust Enrichment)

112.     ICENY realleges every other paragraph of this Complaint.

113.     The defendants' unauthorized use of the I-CE-NY Marks in operating an ice cream shop at the Premises, holding themselves out as duly licensed ICENY franchisee, and using the I-CE-NY Marks, names, confidential recipes and procedures, and proprietary materials has resulted in the unjust enrichment of the defendants in an amount that has yet to be determined.

## COUNT TWELVE

### (Attorneys' Fees)

114.     ICENY realleges every other paragraph of this Complaint.

115.     Sections 20.1.2 and 26.5 of the Franchise Agreement require MM to reimburse ICENY for all costs, including reasonable attorneys' fees, incurred as a result of MM's failure to comply with any provision of the Franchise Agreement and in connection with any action to enforce the terms of the Franchise Agreement.

116.     In addition, the Lanham Act, 15 U.S.C. § 1117, requires an infringer to pay attorney's fees to a trademark owner in appropriate cases.

117.     ICENY has incurred significant costs, including attorneys' fees, as a result of the defendants' failure to comply with the terms of the Franchise Agreement and violations of the Lanham Act.

118.    The defendants are required to pay the costs incurred by ICENY, including without limitation, reasonable attorneys' fees, in an amount to be proven at trial.

## COUNT THIRTEEN

### (Action on Personal Guaranty)

119.    ICENY realleges every other paragraph of this Complaint.

120.    Pursuant to the personal guaranty they executed, Castro and Pico are each individually liable to the same extent as MM for all of MM's breaches of contract, statutory violations, and tortious activity alleged herein, and for all damages, costs, injunctive relief, and other relief to which ICENY is entitled.

## PRAYER FOR RELIEF

**WHEREFORE**, ICENY demands entry of judgment in their favor and against the defendants, jointly and severally, awarding the following relief:

1.    Declaring that the Franchise Agreement has terminated as of June 28, 2019, and that the termination of that Agreement was lawful and valid;

2.    Declaring that the "Mutual Termination and Release Agreement" is invalid and unenforceable;

3.    Awarding ICENY the amounts due under the Franchise Agreement in an amount to be proved at trial, but believed to be in excess of $150,000, plus interest under the terms of the Franchise Agreement through the date of entry of judgment;

4.    Awarding ICENY its damages resulting from the defendants' breach of the post-termination obligations of the Franchise Agreement, in an amount to be proved at trial;

5.    Preliminarily and permanently enjoining the defendants, and all those acting in concert or privity with any or all of them, including any of their agents, servants, employees, and attorneys, from:

(a)      using the I-CE-NY Marks, trade dress, and confidential information, in any manner whatsoever, including, without limitation, in connection with the advertising, promotion or sale of any service, and including, without limitation, all signs, furniture, fixtures, equipment, décor, advertising materials, stationery, forms, and any other articles that display the I-CE-NY Marks or any slogan, décor, or promotional material that is part of the I-CE-NY System;

(b)      operating any business or selling any goods or services under the name ICENY, or any mark confusingly similar to them,  or operating or doing business under any name or mark, or in any manner that is likely to give the public the impression that any business in which the defendants have any interest or connection is licensed by ICENY or otherwise associated with the ICENY urgent care system;

(c)      failing to make any changes and alterations to their formerly-franchised ice cream shop necessary to distinguish them from the I-CE-NY System;

(d)      committing any other act that infringes the I-CE-NY Marks, trade dress, or confidential information or otherwise unfairly competes with ICENY or the I-CE-NY System;

(e)      using, communicating, or disclosing any trade secrets or confidential or proprietary information or know-how of the I-CE-NY System, including without limitation, any recipes, procedures, techniques, or other data that ICENY provided to them;

(f)      for a period of one (1) year from the defendants' compliance, owning, maintaining, engaging in, granting a franchise to, leasing or sub-leasing, making loans to, or having any interest in any business that offers as a core menu item ice cream, frozen yogurts, cakes, pies, smoothies, shakes, specialty beverages, frozen dessert products, or any menu time that constitutes fifteen percent (15%) of sales at I-CE-NY shops or whose method of operation or trade dress is similar to that employed by the System, within a five (5) mile radius of the Premises or any then-existing I-CE-NY shop.

6.      Ordering the defendants to file with the Court and serve on counsel for the plaintiffs, within five (5) calendar days after entry of any injunction issued herein, a written report setting forth in detail, under oath, the manner and form in which it has complied with such injunction;

7.      Awarding, pursuant to 15 U.S.C. §1117, (a) the defendants' profits, (b) ICENY's damages, and (c) the costs of the action or awarding ICENY statutory damages pursuant to 5 U.S.C. § 1117(c);

8.      Awarding ICENY treble damages and attorneys' fees pursuant to 15 U.S.C. §§ 1117(a) and (b);

9.      Ordering specific performance of the post-termination obligations in the Franchise Agreement;

10.     Awarding ICENY the amount by which the defendants have been unjustly enriched by their conduct;

11.     Awarding ICENY its costs in prosecuting these claims, including its reasonable attorneys' fees incurred, in accordance with the Franchise Agreement and applicable law; and

12.     Such other and further relief as the Court may deem appropriate.


Respectfully submitted,



_____/s/ Leslie J. Pujo_____
Leslie J. Pujo
Benjamin B. Reed (*Pro hac vice* motion to be filed)
James C. Rubinger (*Pro hac vice* motion to be filed)
PLAVE KOCH PLC
12005 Sunrise Valley Drive, Suite 200
Reston, Virginia  20191
703-774-1200 (phone)
703-774-1201 (fax)
lpujo@plavekoch.com
breed@plavekoch.com
jrubinger@plavekoch.com

*Attorneys for the Plaintiff*

August 21, 2019