ICENY USA, LLC,

    Plaintiff,

    v.

M&M'S, LLC,
MARVIN CASTRO MONDRAGON and
GABRIEL EUGENE PICO,

    Defendants.

Civil Action No. TDC-19-2418

## MEMORANDUM OPINION

Plaintiff ICENY USA, LLC ("ICENY"), a company specializing in the preparation, marketing, and sale of Thai-style rolled ice cream products, has filed suit against Defendants M&M's, LLC, Marvin Castro Mondragon, and Gabriel Eugene Pico, alleging trademark infringement and breach of contract claims arising out of a franchise agreement authorizing Defendants to operate an ICENY Thai-style ice cream shop franchise. Pending before the Court is ICENY's Motion for a Temporary Restraining Order and Preliminary Injunction. On September 6, 2019, after a hearing at which Defendants failed to appear, the Court entered a temporary restraining order ("TRO") against Defendants. On October 1, 2019, the Court held a preliminary injunction hearing at which Defendants again failed to appear. For the reasons set forth below, the Motion, now construed as a Motion for a Preliminary Injunction, is GRANTED IN PART and DENIED IN PART.

# BACKGROUND

ICENY, a company based in Silver Spring, Maryland, considers itself to be at the forefront of the development of contemporary ice cream shops featuring Thai-style smashed and rolled ice cream products. ICENY opened its first ice cream shop in the United States in 2016 and licenses such enterprises as franchises, stylized as "I-CE-NY" shops, across the country. Am. Compl. ¶ 1, ECF No. 9. ICENY has registered the mark "I-CE-NY" with a distinctive logo with the U.S. Patent and Trademark Office, which has assigned it registration number 5,120,527. *Id.* ¶ 12. ICENY also uses other unregistered trade names, marks, logos, and slogans in connection with the proprietary goods and services offered in I-CE-NY shops, specifically its system to prepare, market, and sell Thai ice cream rolls (the "ICENY System"). Included in the ICENY System are the slogans "they see me rollin'" and "lick me, I'm yours." Teeradej Naruenartwanich Decl. ¶ 7, ECF No. 10-2.

Employees at I-CE-NY franchises prepare Thai ice cream rolls tailored to customers' orders by pouring flavored, milk-based liquid onto a very cold metal surface, known as an "anti-griddle," and spreading and manipulating the liquid with small paddles as it freezes. Am. Compl. ¶ 10. The milk-based liquid is prepared according to ICENY's proprietary specifications and secret recipes which also allow for fruit, candy, or other flavoring to be mixed into the liquid base. As the liquid base freezes into ice cream on the surface of the anti-griddle, an employee uses a spatula to turn strips of the ice cream into rolls. The rolls are then served with toppings requested by the customer, who may choose from certain special combinations displayed in the shop.

## I.     The Franchise Agreement

Effective July 13, 2018, ICENY and M&M's, LLC ("M&M"), of which Castro and Pico are members, entered into a franchise agreement ("the Franchise Agreement") to open and operate an I-CE-NY ice cream shop at 1979 East 16th Street, Suite SB-7, Yuma, Arizona 85366 ("the

Shop"). The Shop was the first Thai ice cream roll shop in the Yuma, Arizona area. ICENY alleges that, as franchisees, Defendants were taught how to make Thai ice cream rolls; trained in the management and operation of an I-CE-NY ice cream shop; and authorized to use ICENY's registered mark and other proprietary materials from the ICENY System, including confidential recipes and ingredient specifications, an operations manual, marketing photographs and other material for use on social media, distinctive exterior and interior décor, slogans, color schemes, fixtures, and furnishings. The Franchise Agreement permitted Defendants to operate the Shop as an I-CE-NY ice cream shop for a period of 10 years, but Defendants did so only from January 2019 until April 2019.

As relevant here, the Franchise Agreement required M&M to pay ICENY initial franchise fees, weekly royalties, and brand fund contributions, and to report weekly net sales. The Franchise Agreement also provided that M&M may not disclose "trade secrets and confidential and proprietary information and know-how" associated with the ICENY System "during the term of [the Franchise] Agreement or at any time thereafter" and may not use or duplicate, or disclose to others such that they might use or duplicate, the ICENY System within any other business. Franchise Agreement ¶¶ 15.1.1, 15.1.2, Mot. Prelim. Inj. Ex. 1 at 29-30, ECF No. 10-6. M&M is also not permitted to "sell, assign, transfer, convey, pledge, encumber or give away any direct or indirect interest" in the Franchise Agreement or "in substantially all of the assets" of the Shop without ICENY's prior written consent. Franchise Agreement ¶ 16.2. Upon termination or expiration of the Franchise Agreement, M&M must immediately cease operating the Shop and using the I-CE-NY mark and the ICENY System, pay any amounts owed to ICENY, and make any necessary alterations and modifications to the Shop to clearly distinguish it from its former appearance as an I-CE-NY franchise.

3

Finally, the Franchise Agreement contains non-competition provisions that state:

> You covenant and agree that, except as we otherwise approve in writing, during the Initial Term, and for a continuous period of one (1) year following the expiration, transfer or termination of this Agreement, you will not, either directly or indirectly, for yourself or through, on behalf of, or in conjunction with any person or legal entity . . . Own, maintain, operate, engage in, grant a franchise to, advise, help. . . or have any interest in, either directly or indirectly, any "**Competing Business**", which is defined as: (1) a restaurant business that offers as a core menu item ice cream, frozen yogurt, cakes, pies, smoothies, shakes, specialty beverages, frozen dessert products, or any menu item that constitutes fifteen percent (15%) of sales at I-CE-NY shops; or (2) whose method of operation or trade dress is similar to that employed by the System. During the term of this Agreement, there is no geographical limitation on this restriction. Following the expiration, transfer or termination of this Agreement, this restriction shall apply to any Competing Business located within a five (5) mile radius of [the Shop] and any Competing Business located within a five (5) mile radius of any then-existing I-CE-NY shop[.]

Franchise Agreement ¶¶ 15.2.2, 15.2.2.1 ("the Non-Competition Clause").

In the Franchise Agreement, Castro and Pico, as owners and members of M&M, agreed to be personally bound by the Non-Competition Clause and the covenants requiring non-disclosure or unauthorized use of the ICENY System, and to personally guarantee and assume M&M's obligations under the Franchise Agreement.

## II.    The Termination

In early April 2019, Castro requested that ICENY Director of Operations Teeradej Naruenartwanich meet with M&M's landlord to discuss issues related to the lease for the Shop. On April 10, 2019, Naruenartwanich met with the landlord, who requested that Naruenartwanich sign a guarantee of the lease. Naruenartwanich told the landlord to send the document to him by email, as he could not sign an agreement he had not seen before. Naruenartwanich never received this document. Then, as of April 12, 2019, Defendants ceased all communication with ICENY. Specifically, they stopped providing sales reports and making franchise fee payments as required by the Franchise Agreement. Naruenartwanich and ICENY President Apisit Sutthisophaarporn unsuccessfully attempted to contact both M&M and Castro multiple times in May and June 2019.

4

On June 23, 2019, Naruenartwanich traveled to Yuma, Arizona to assess the status of Defendants' business and their failure to pay franchise fees. Naruenartwanich discovered that Castro had taken steps to change the name of the Shop from "I-CE-NY" to "PARAD-ICE CREAM ROLLS." Naruenartwanich Decl. ¶ 4. Although the store had a sign referencing the business name "PARAD-ICE," the exterior sign on the Shop continued to display the I-CE-NY mark, the interior décor had not changed, and the cups and supplies inside the Shop continued to bear the I-CE-NY mark. The same Thai ice cream rolls sold under the I-CE-NY brand, and made pursuant to ICENY's proprietary recipes and procedures, were being sold under different names. When Naruenartwanich informed Castro that the changes were in breach of the Franchise Agreement, Castro advised that he had turned over the business to another party and was no longer involved in its operation. Before Naruenartwanich left Yuma, however, he returned to the Shop and observed Castro and his fiancée working inside.

On June 28, 2019, ICENY issued a Notice of Default and Termination to M&M. The Notice cited as grounds for termination the failure to pay franchise fees and royalties on sales; the failure to report net sales on a weekly basis; various activities that violated the Franchise Agreement, including selling unapproved products, using non-ICENY marks, and using ICENY's marks in a business with a different name; and transferring the business to another party operating an ice cream business without ICENY's consent. ICENY demanded that M&M pay past-due royalties and early termination damages and that it comply with the post-termination obligations outlined in the Franchise Agreement, including ceasing the use of the I-CE-NY mark and confidential and proprietary materials, and complying with the covenant not to compete with ICENY.

In response, on July 2, 2019, an attorney for M&M and Castro, Jon Schneider, sent to ICENY's counsel a "Mutual Termination and Release Agreement," allegedly signed by Naruenartwanich and Castro on April 10, 2019 and sent to Sutthisophaarporn on June 19, 2019, four days before Naruenartwanich's June 23, 2019 visit to the Shop. Mot. Prelim. Inj. Ex. 3, ECF No. 10-8. The Mutual Termination and Release Agreement ("the Mutual Termination") purported to release all claims between the parties, waive certain post-termination requirements, such as the Non-Competition Clause, and acknowledge that M&M had made a $15,000 cash payment as a complete settlement of its financial obligations. Both ICENY and Naruenartwanich strenuously dispute the validity of this document, deny ever receiving such cash payment, and assert that Naruenartwanich's signature on the document is either forged or copied from another document. Although the Mutual Termination contains a signature block for a notary public to attest that Naruenartwanich and Castro actually signed the document, that signature block was not completed. According to Naruenartwanich, and as confirmed by a recording of his meeting with Castro on June 23, 2019, Castro did not refer to the Mutual Termination during that meeting. After ICENY's counsel informed Schneider on July 9, 2019 that ICENY considered the Mutual Termination to be a forgery, Schneider informed ICENY on July 15, 2019 that M&M and Castro had retained new counsel, Leonard Sominsky. Sominsky later advised ICENY's counsel that he represented only Castro individually for purposes of filing a Chapter 7 bankruptcy.

### III.    Post-Termination

On July 24 and 29, 2019, ICENY reviewed the PARAD-ICE website and social media pages and notified Sominsky that Defendants were still improperly using the ICENY System and infringing on ICENY's mark in their operation of the Shop and in online marketing. ICENY specifically asserted that pictures viewable on the Shop's Yelp, Facebook, and Instagram pages used ICENY marketing images previously provided to Defendants before the termination of the

Franchise Agreement, and that these pages also displayed images of I-CE-NY-branded serving cups, artwork, and slogans. Together with Naruenartwanich's observations of the Shop in June 2019, ICENY asserted that this conduct reflected that Castro was continuing to operate the Shop in violation of the Franchise Agreement's post-termination obligations.

On July 30 and August 1, 2019, Sominsky reported to ICENY's counsel that Castro had "surrendered the store he once operated as . . . franchisee to his landlord" and had "handed over the keys to his manager Mr. Gabriel Pico," who continued to operate the Shop but apparently had not informed the landlord or ICENY. Sominsky Emails, Mot. Prelim. Inj. Ex. 8 at 1, 3, ECF No. 10-13. On August 19, 2019, however, the landlord informed Sutthisophaarporn that M&M and Castro remained in possession of the Shop, but that Castro wanted to assign the lease to another party.

On August 22, 2019, Naruenartwanich again reviewed PARAD-ICE's Facebook, Yelp, and Instagram pages and saw that "they were largely unchanged" and continued to display the I-CE-NY mark and ICENY's artwork on cups and paper goods at the Shop. Naruenartwanich Decl. ¶ 13.

On September 26, 2019, a private investigator retained by ICENY visited the Shop and observed that it was still operating as a Thai ice cream roll business using materials from the ICENY System. Although the Shop uses the name PARAD-ICE, the I-CE-NY mark remains displayed above the front entrance to the Shop; the I-CE-NY name appears on the framed business license displayed inside the Shop; and the mark is stamped on the serving cups and spoons used at the Shop. The Shop also continues to prepare the Thai ice cream rolls using the same anti-griddle introduced by ICENY. As of September 30, 2019, the PARAD-ICE Facebook page associated with the Shop displayed pictures of Thai rolled ice cream, the I-CE-NY mark, and the ICENY

7

slogan, "lick me, I'm yours." Second Apisit Sutthisophaarporn Decl. ¶ 2, ECF No. 27. The PARAD-ICE website refers to possible franchising of PARAD-ICE shops and references "Proprietary and Proven Recipes," which ICENY contends are its recipes made available to Defendants pursuant to the Franchise Agreement. *Id.*

## IV. Procedural History

On August 21, 2019, ICENY filed suit in this Court against Defendants. In its Amended Complaint, filed on August 22, 2019, it seeks a declaratory judgment that the Franchise Agreement was validly terminated and that the Mutual Termination is invalid and unenforceable. ICENY also asserts claims for: (1) breach of contract for failure to pay franchise fees and royalties and to comply with post-termination obligations and the Non-Competition Clause; (2) federal and state trademark infringement and unfair competition for unauthorized use of the I-CE-NY mark and other proprietary materials and information associated with the ICENY System; and (3) unjust enrichment from Defendants' continued operation of the Shop and use of ICENY's mark, confidential recipes and procedures, and proprietary materials. ICENY also requests attorney's fees and costs.

On August 23, 2019, ICENY filed its Motion for a Temporary Restraining Order and a Preliminary Injunction seeking to enjoin Defendants and their "agents, employees, affiliated companies, attorneys, and all those in active concert or participation with any of them" from, in substance: (1) using the I-CE-NY mark and ICENY System, including trade dress and confidential information, in any manner whatsoever; (2) operating any business or selling of any goods or services under the name I-CE-NY, or any mark confusingly similar to it, or under any name or mark in any manner likely to give the public the impression that Defendants are associated with the ICENY System; (3) failing to alter the formerly franchised Shop in a manner necessary to

distinguish it from the ICENY System; and (4) disclosing any trade secrets, confidential or proprietary information, or know-how of the ICENY System, including without limitation, any recipes, procedures, techniques, or other data that ICENY provided to them. ICENY also requests an injunction requiring that, for a period of one year from Defendants' compliance with the preceding restrictions, Defendants refrain from operating a business that would violate the Franchise Agreement's Non-Competition Clause.

On September 5, 2019, the Court held a hearing on the Motion. No Defendant appeared or opposed the Motion. At the hearing, ICENY's counsel advised the Court that Pico was formally served with process on August 28, 2019. Although copies of the Amended Complaint and Motion were sent by Federal Express with a signature requirement to the other Defendants' last known addresses, the packages were not delivered because no one was present to sign for them. ICENY also sent copies of the Amended Complaint, the Motion, and hearing notice to Sominsky, the last-known counsel for Castro, and the Court sent an email notice of the hearing to Sominsky, but there was no confirmation that Sominsky provided those materials to any of Defendants. Consequently, the Court considered only whether a TRO should be granted.

Based on the submitted materials, the Court granted a TRO and enjoined Defendants for a period of 14 days from using the I-CE-NY mark, using or disclosing ICENY's confidential or proprietary methods, processes, or recipes obtained pursuant to the Franchise Agreement, or continuing to use slogans, tag lines, artwork, photographs, décor or other intellectual property provided by ICENY. The TRO also barred Defendants, pursuant to the Non-Competition Clause, from operating a business offering Thai ice cream rolls at the Shop or within a five-mile radius of the Shop or another I-CE-NY shop. The TRO went into effect on September 12, 2019, the date that ICENY posted the required bond, and was set to expire on September 26, 2019. Because

ICENY continued to have difficulties effecting service of process on Castro and M&M, the Court found good cause to the extend the TRO, pursuant to two different orders, for a total of 14 additional days, until October 10, 2019.

On October 1, 2019, the Court held a preliminary injunction hearing. Defendants again failed to appear or oppose the Motion. Because ICENY had yet to effect service of process on M&M or Castro, ICENY's counsel narrowed the current request to a preliminary injunction against Pico.

## DISCUSSION

In its Motion for a Preliminary Injunction, ICENY seeks to extend the TRO on an indefinite basis and seeks the full relief originally sought in the Motion. ICENY's request stems from three central theories of liability: (1) that Defendants' continued use of ICENY's mark and the ICENY System after the termination of the Franchise Agreement constitutes a breach of contract; (2) that Defendants continued use of ICENY's mark and the ICENY System after termination of the Franchise Agreement constitutes trademark infringement and unfair competition under the Lanham Act; and (3) Defendants continued operation of the Shop after the termination of the Franchise Agreement constitutes a breach of the Franchise Agreement's Non-Competition Clause. The Court thus analyzes the Motion across this framework.

## I.    Legal Standard

To obtain a preliminary injunction, moving parties must establish that: (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). A moving party must satisfy each requirement

as articulated. *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009), *judgment vacated on other grounds*, 559 U.S. 1089 (2010). Because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

## II.  Notice

As an initial matter, the Court addresses whether it may properly enter a preliminary injunction where none of Defendants have appeared at a hearing or filed a memorandum in opposition to the Motion.  Federal Rule of Civil Procedure 65 provides that a preliminary injunction may issue "only on notice to the adverse party." Fed. R. Civ. P. 65(a).  Consistent with that principle, a preliminary injunction order "binds only" the parties, "the parties' officers, agents, servants, employees, and attorneys," and those "in active concert or participation with them" who "receive actual notice of [the order] by personal service or otherwise." Fed. R. Civ. P. 65(d).

To comport with due process and the requirements of Rule 65, courts generally require the adverse party to have notice and an opportunity to be heard, ideally through formal service of process and actual notice that a preliminary injunction might issue. *See Gilchrist v. Gen. Elec. Capital Corp.*, 262 F.3d 295, 301 (4th Cir. 2001) (observing that, pursuant to Rule 65(d), unless the adverse parties "were served with process, the district court could be without power to enforce an injunction against them unless, of course, they could be shown to have been in active concert or participation with parties over whom the court had jurisdiction"); *Lake Shore Asset Mgmt., Ltd. v. Commodity Futures Trading Comm'n*, 511 F.3d 762, 767 (7th Cir. 2007) (stating that, in the absence of service of process and an opportunity to present evidence, no action to enforce a preliminary injunction could proceed).  At a minimum, actual notice of the motion for a preliminary injunction is required. *See In re Lease Oil Antitrust Litig. (No. II)*, 200 F.3d 317, 319

(5th Cir. 2000) (requiring "actual notice and an opportunity to be heard"); *see also Fryzel v. Mortgage Electronic Registration Systems, Inc.*, 719 F.3d 40, 44-46 (1st Cir. 2013) (ruling that preliminary injunctions enjoining mortgagees were invalid where the mortgagees were not provided with formal notice, among other deficiencies in the lower court's findings). Notice may be provided in a court's order to a properly served party. *See In re Lease Oil Antitrust Litig.*, 200 F.3d at 319 (finding that notice was sufficient where the defendant was warned in the district court's order enjoining other defendants that it would also be enjoined if its motion to dismiss was denied). "Preliminary injunctions issued without notice to the opposing party are generally dissolved." *United States v. Microsoft Corp.*, 147 F.3d 935, 944 (D.C. Cir. 1998).

As of the October 1, 2019 preliminary injunction hearing, ICENY had submitted affidavits from a process server establishing that Pico had been served on August 28, 2019 with process containing the Summons, First Amended Complaint, and the Court's Case Management Order. A second process server affidavit confirmed that, on September 12, 2019, Pico was served with the Court's TRO, which provided the date of the preliminary injunction hearing and specifically warned Defendants that if they failed to appear or otherwise respond to the Motion, "a preliminary injunction may be entered without further notice." TRO at 5, ECF No. 17. The Clerk of the Court mailed the Order notifying Defendants of the rescheduling of the preliminary injunction hearing to October 1, 2019 to Pico's last known home address, and ICENY mailed this Order to both the address at which Pico was served and his last known home address. *See* Fed. R. Civ. P. 5(b)(2) (stating that for a properly served party, notice of papers filed after the complaint can be accomplished by mailing the filing to the person's last known address). Despite formal service of process and the subsequent notifications, Pico neither filed a memorandum in opposition to the Motion nor appeared on either hearing date. Under these circumstances, the Court finds that Pico

received actual notice of the Motion and an opportunity to be heard, such that, if warranted, the Court may issue a preliminary injunction against him.

In contrast, Castro and M&M have not yet been served with process. Despite several attempts to send ICENY's filings and the Court's orders to Castro individually and in his capacity as registered agent for M&M, which have included attempted personal service at the Shop and at Castro's last known address, sending the documents by certified mail to Castro's last known address, and emailing the documents to Castro's last known attorney, no confirmation of delivery has been received. Thus, at this point, the Court is not empowered to enter a preliminary injunction against the unserved Defendants. To the extent that a preliminary injunction against Pico, his agents and employees, and "other persons who are in active concert and participation" with him could encompass Castro, such an injunction would be enforceable against Castro only once he receives actual notice of the Court's order. *See* Fed. R. Civ. P. 65(d)(2).

## III.    Likelihood of Success on the Merits

To meet the first requirement for a preliminary injunction, moving parties must "clearly demonstrate" that they "will *likely succeed* on the merits," rather than present a mere "grave or serious question for litigation." *Real Truth*, 575 F.3d at 346-47. To succeed in all respects on its Motion, ICENY must clearly demonstrate that it is likely to succeed on its three central theories of liability. The Court will analyze each in turn.

### A.    Breach of Contract

Even at this preliminary stage, there appears to be no dispute that Defendants owed ICENY contractual obligations arising from the parties' executed Franchise Agreement. Paragraph 26.2 of the Franchise Agreement provides that the contract "shall be governed by and construed in

accordance with the laws of the State of Maryland." Franchise Agreement ¶ 26.2. Thus, Maryland law controls.

To establish a breach of contract under Maryland law, a plaintiff must prove "that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001). Under Maryland law, contract terms are interpreted by considering the "customary, ordinary, and accepted meaning of the language used." *Fister v. Allstate Life Ins. Co.*, 783 A.2d 194, 199 (Md. 2001).

The Franchise Agreement became effective on July 13, 2018 and, pursuant to its terms, authorized M&M to establish a franchised I-CE-NY ice cream shop. Defendants opened and operated the franchise from January 2019 to April 2019 and were bound to abide by the contract's obligations, including the requirement to remit franchise fees and royalties; the bar on disclosure of confidential and proprietary information associated with the ICENY System; the prohibition on transferring an interest in the Franchise Agreement without ICENY's consent; and the requirement of compliance with post-termination obligations, including the Non-Competition Clause. ICENY issued a Notice of Default and Termination, effective June 28, 2019, after Defendants breached their payment obligations in April 2019 and ICENY discovered that Defendants were effectively operating a competing Thai ice cream roll business at the Shop by rebranding the store as PARAD-ICE. ICENY had also learned from Castro that he had transferred the business to a third party, whether to Pico or another individual or entity, without ICENY's consent. Where the undisputed evidence supports a finding of multiple breaches of the Franchise Agreement, the Court finds that ICENY is likely to succeed on the merits of its claim that the Defendants breached a valid contract between the parties as of the Notice of Default and Termination.

Of greater relevance to the Motion is the fact that ICENY has demonstrated that it is likely to succeed on its claim that Defendants further breached the Franchise Agreement after its termination by continuing to use, without authority, the I-CE-NY mark and components of the ICENY System. Under the Franchise Agreement, upon termination, Defendants were required to "immediately cease operating" the Shop as an I-CE-NY franchise, return to ICENY the operations manual and all "confidential information, trade secrets, or know-how," "immediately cease to use the confidential methods, procedures, and techniques associated" with the ICENY System, the "'I-CE-NY' name and mark," and the "slogans, signs, symbols, websites, domain names, e-mail addresses, telephone numbers, other electronic identifiers, and devices" associated with the franchise, and "promptly make such alterations and modifications" to the Shop "as may be necessary to clearly distinguish" it "from its former appearance as an I-CE-NY shop." Franchise Agreement ¶¶ 20.1-20.1.5. Defendants were further prohibited from using "any reproduction counterfeit, copy, or colorable imitation" of the I-CE-NY mark and materials associated with the ICENY System "in connection with any other business which . . . is likely to cause confusion, mistake, or deception, or to dilute [ICENY's] rights . . . or falsely suggests or represents an association or connection with [ICENY]." *Id.* ¶ 20.1.7.

The record reflects that the Shop is still operating and serving Thai ice cream rolls using the ICENY System well after the date ICENY issued Defendants its Notice of Default and Termination. In July 2019 and August 2019, ICENY management accessed the PARAD-ICE website and social media pages and saw serving cups stamped with its mark and design. On September 30, 2019, Sutthisophaarporn observed on the PARAD-ICE Facebook page a video displaying the I-CE-NY mark and a photograph showing the Shop with the ICENY slogan "lick me, I'm yours" on the wall.

On September 26, 2019, a private investigator retained by ICENY visited the Shop and observed that, although it was operating under the name PARAD-ICE, it was still selling Thai ice cream rolls using materials from the ICENY System. The I-CE-NY mark remains displayed above the front entrance to the Shop, and the mark is stamped on the serving cups and spoons used at the Shop. The Shop also continues to prepare the Thai ice cream rolls using the same anti-griddle introduced by ICENY and is likely using ICENY's proprietary recipes.

Thus, the evidence establishes that Defendants have not fully de-identified either the Shop's brick-and-mortar location or PARAD-ICE's online presence to fully demonstrate that the Shop is no longer associated with ICENY, as required by the Franchise Agreement. The Court finds that ICENY is likely to succeed on its breach of contract claim that Defendants have failed to honor their contractual post-termination obligations, including by continuing to use the I-CE-NY mark and the ICENY System.

At this stage of the case, the Mutual Termination provides no basis to alter this conclusion. First, where ICENY has provided undisputed affidavits that Naruenartwanich did not sign the Mutual Termination and that it is a forgery, the Court will not find that it is likely enforceable. Even if it were valid, by its own terms, the Mutual Termination provides that Defendants were required to de-identify as an ICENY franchise, including by removing all signs of ICENY's proprietary marks as defined in the Franchise Agreement. The Mutual Termination also required Defendants to cease any use of the proprietary marks in advertising and printed material and cease any use of confidential information, which would include ICENY's secret recipes. As discussed above, however, ICENY has submitted evidence that Defendants continued to use such information in the Shop and in online advertising and postings. Thus, the Court concludes that ICENY has established a likelihood of success on the breach of contract claim.

**B.    Lanham Act**

ICENY also asserts that, since it terminated the Franchise Agreement, Defendants are infringing its registered mark "I-CE-NY" and the unregistered components of the ICENY System while operating the Shop under the name PARAD-ICE, in violation of the Lanham Act. The Lanham Act creates a cause of action against:

> Any person who shall, without the consent of the registrant—(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive[.]

15 U.S.C. § 1114(1)(a).

In order to prevail on its claim of trademark infringement under 15 U.S.C. § 1114(1), ICENY must show that: (1) it owns a valid mark; (2) the defendant used the mark in commerce and without the plaintiff's authorization; (3) the defendant used the mark, or an imitation of it, in connection with the sale, offering for sale, distribution, or advertising of goods or services; and (4) the defendant's use of the mark is likely to confuse consumers. *Rosetta Stone, Ltd. v. Google, Inc.,* 676 F.3d 144, 152 (4th Cir. 2012); *Mayson-Dixon Strategic Consulting, LLC v. Mason-Dixon Polling & Strategic Consulting, Inc.,* 324 F. Supp. 3d 569, 575 (D. Md. 2018).

Unauthorized use of a trademark infringes the trademark holder's rights if it is likely to confuse an ordinary consumer as to the source or sponsorship of the goods. *Lone Star Steakhouse & Saloon Inc. v. Alpha of Va., Inc.,* 43 F.3d 922, 933 (4th Cir. 1995). In the context of franchise cases specifically, courts have found a high risk of consumer confusion when a terminated franchisee continues to use the former franchisor's trademarks. *See, e.g., Merry Maids Ltd. Partnership v. Kamara,* 33 F. Supp. 2d 443, 445 (D. Md. 1998) (collecting cases). This potential for confusion is particularly acute following the termination of a franchisor-franchisee relationship

because of the parties' past affiliation and the ease of their association in the public's mind. *See Burger King Corp. v. Mason*, 710 F.2d 1480, 1492 (11th Cir. 1983) ("Common sense compels the conclusion that a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks"). Because "[a]ny shortcomings of the franchise" would be attributed to the franchisor, "continued trademark use by one whose trademark license has been canceled satisfies the likelihood of confusion test and constitutes trademark infringement." *Id.* at 1493.

Here, ICENY has registered the mark "I-CE-NY" with the U.S. Patent and Trademark Office. Under the Franchise Agreement, Defendants had a license to use the mark while operating as an I-CE-NY franchise. However, they lost that right upon the termination of the Franchise Agreement on June 28, 2019 for, in part, using the mark and ICENY System as part of the PARAD-ICE business. A private investigator who visited the Shop on September 26, 2019 confirmed through photographs that the I-CE-NY mark continues to appear prominently in the signage above the Shop, at the exact location where Defendants' formerly operated an authorized I-CE-NY franchise, but are now operating the business under the name PARAD-ICE. The photographs taken on September 26, 2019 also show that Defendants are continuing to serve Thai ice cream rolls using paper cups and spoons with the mark "I-CE-NY" imprinted upon them. Based on images submitted by ICENY, as of September 30, 2019, Defendants' online and social media sites contain public images and a video that display the I-CE-NY mark. Particularly where Defendants are continuing to operate the same type of business at the same location as the I-CE-NY franchise, the Court finds it highly likely that consumers will be misled or confused as to whether there remains an association between ICENY and Defendants. *See Burger King*, 710 F.2d at 1493.

Thus, ICENY has clearly demonstrated a likelihood of success on the merits of its trademark infringement claim.

ICENY also asserts a claim for unfair competition under 15 U.S.C. § 1125(a) of the Lanham Act. This provision creates a cause of action against:

> Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol . . . or any combination thereof . . . which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a)(1)(A). This section "generally has been construed to protect against trademark, service mark, and trade name infringement even though the mark or name has not been federally registered." *Perini Corp. v. Perini Constr.., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990). The test for an unfair competition claim is essentially the same as the test for trademark infringement and requires a plaintiff to show that: "(1) it possesses a mark; (2) the defendant used the mark; (3) that the defendant's use of the mark occurred 'in commerce'; (4) that the defendant used the mark 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services; and (5) that the defendant used the mark in a manner likely to confuse consumers. *People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 364 (4th Cir. 2001); *Mayson-Dixon Strategic Consulting*, 324 F. Supp. 3d at 580 (citations omitted).

Presumably under this provision, ICENY contends that the use of its unregistered slogans, "lick me, I'm yours" and "they see me rollin,'" violates the Lanham Act because Defendants continued to use them without authorization following the termination of the Franchise Agreement. ICENY has presented evidence that as of late June 2019, the slogan "they see me rollin'" continued to appear on the wall of the Shop after it had been re-branded as PARAD-ICE. As of September 30, 2019, photographs on PARAD-ICE's Facebook page show the slogan "lick me, I'm yours" on

the wall of the Shop. As with the registered mark, the Court finds that, where Defendants had been operating an I-CE-NY franchise at the Shop and continued to use ICENY's slogans, there is a likelihood of confusion sufficient to support a Lanham Act claim under § 1125(a). The Court therefore concludes that ICENY is likely to succeed on its Lanham Act claims of trademark infringement and unfair competition.

To the extent that ICENY also claims that the Lanham Act protects against the unauthorized use of other unregistered but proprietary artwork and business methods within the ICENY System, the Court need not address this issue because, as discussed above, the Court finds that ICENY has shown a likelihood of success on the merits of its claim that the use of such information constitutes a breach of contract.

### C. State Trademark Infringement and Unfair Competition

Maryland law applies the same legal framework for trademark infringement and unfair competition claims as the Lanham Act. *See Perini Corp.*, 915 F.2d at 125 n.3 ("We note that although the legal framework we here apply is derived from . . . the Lanham Act, Maryland law would provide the same framework."); *Mayson-Dixon Strategic Consulting*, 324 F. Supp. 3d at 580. Accordingly, ICENY is also likely to succeed on its state law trademark infringement and unfair competition claims.

### D. Non-Competition Clause

ICENY also seeks to establish that it is likely to succeed on its breach-of-contract claim that Defendants' continued operation of the Shop violates the Franchise Agreement's Non-Competition Clause. Because the Franchise Agreement is governed by Maryland Law, *see supra* part III.A., Maryland law will control the construction and enforceability and of the Non-Competition Clause. As discussed above, because the record currently contains undisputed

evidence that the Mutual Termination was a forgery, *see supra* part III.A., the Court concludes

that its provisions did not terminate or rescind the applicability and enforceability of the Non-

Competition Clause.

Under Maryland law, a non-competition provision is enforceable "if the restraint is

confined within limits which are no wider as to area and duration than are reasonably necessary

for the protection of the business the employer and do not impose undue hardship on the

employee or disregard the interests of the public." *Becker v. Bailey*, 299 A.2d 835, 838 (Md.

1973); *Ledo Pizza System, Inc. v. Singh*, 983 F. Supp. 2d 632, 641 (D. Md. 2013). If the scope of

the covenant is reasonable on its face, the court will then examine the facts and circumstances of

the individual case. *Millward v. Gerstung Int'l Sport Ed., Inc.*, 302 A.2d 14, 16 (Md. 1973); *Ledo*,

983 F. Supp. 2d at 641. In the context of restricting the business activities of a former franchisee,

the Court of Appeals of Maryland has found the following considerations relevant:

> whether the person sought to be enjoined is an unskilled worker whose services are
> not unique; whether the covenant is necessary to prevent the solicitation of
> customers or the use of trade secrets, assigned routes, or private customer lists;
> whether there is any exploitation of personal contacts between the employee and
> customers; and, whether enforcement of the clause would impose undue hardship
> on the employee or disregard the interests of the public.

*Budget Rent A Car of Washington, Inc. v. Raab*, 302 A.2d 11, 13 (Md. 1973).

Here, the Non-Competition Clause provides that for a period of one year following

termination of the Franchise Agreement, Defendants may not:

> Own, maintain, operate, engage in, grant a franchise to, advise, help. . . or have any
> interest in, either directly or indirectly, any "**Competing Business**", which is
> defined as: (1) a restaurant business that offers as a core menu item ice cream,
> frozen yogurt, cakes, pies, smoothies, shakes, specialty beverages, frozen dessert
> products, or any menu item that constitutes fifteen percent (15%) of sales at I-CE-
> NY shops; or (2) whose method of operation or trade dress is similar to that
> employed by the System. During the term of this Agreement, there is no
> geographical limitation on this restriction. Following the expiration, transfer or
> termination of this Agreement, this restriction shall apply to any Competing

Business located within a five (5) mile radius of [the Shop] and any Competing Business located within a five (5) mile radius of any then-existing I-CE-NY shop[.]

Franchise Agreement ¶¶ 15.2.2, 15.2.2.1.

ICENY has demonstrated that Defendants were bound by the terms of the Non-Competition Clause of the Franchise Agreement, and that Defendants had a contractual obligation to abide by its terms following termination of the contract. The evidence also plainly establishes that Defendants have likely breached these terms. Based on Naruenartwanich's observations and photographs from June 2019, photographs from September 26, 2019, as well as the online and social media postings in the record, Defendants continue to operate the Shop as one serving Thai ice cream rolls using the same method of operation it used before the termination of the Franchise Agreement. Although the Shop is now named PARAD-ICE, the signage, slogans, serving products, and presentation of ice cream rolls are the same or similar to those of ICENY.

In light of this undisputed evidence, the only question to consider is whether the Non-Competition Clause is enforceable. ICENY argues that the provision is reasonable as to time and geography, and that its scope is limited to barring Defendants from engaging in the same business they operated as franchisees. Maryland courts have found a time restriction of two or more years to be reasonable, as well as territorial restrictions that have extended beyond a five-mile radius. *See, e.g.*, *NaturaLawn*, 484 F. Supp. 2d at 399-400 (finding that a two-year prohibition on former franchisees operating a lawn care business within 20 miles of an existing NaturaLawn franchise was reasonable under Maryland law); *Budget Rent A Car*, 302 A.2d at 12-13 (observing that a non-competition clause prohibiting city-wide operation of a car rental business for two years was facially reasonable, but declining to enforce the clause on other grounds).

Upon consideration of the facts and circumstances in the record to date, the Court finds that the scope of the Non-Competition Clause is reasonable to the extent that it bars Defendants

from operating a business selling Thai ice cream rolls or other frozen desserts in light of the need to protect ICENY's goodwill as franchisor. In *Ledo*, a pizza franchisor sought to enjoin its former franchisee from operating a comparable and competing pizza restaurant in violation of both a non-competition clause in a franchise agreement and a TRO imposed by the court. *Ledo*. 983 F. Supp. 2d at 636-37, 642. In addition to finding the two-year duration and 10-mile geographic scope of the clause enforceable under Maryland law, the court found the bar on operating a pizza restaurant reasonable because the defendant was still operating a pizza business at the same location, though under a different name, following the TRO; he had received "extensive training" from Ledo on how to run a pizza franchise; he was using Ledo's trade secrets, including some of its recipes; and he was actively soliciting former Ledo's customers. *Id.* at 637, 642. The court also found that the defendant's renamed restaurant threatened Ledo's goodwill and reputation with its customers, current and prospective franchisees, and vendors. *Id.* at 643.

Here, considering the *Budget Rent A Car* factors, the Court finds that the Non-Competition Clause is likewise necessary to prevent the solicitation of former ICENY customers and to prevent the use of ICENY's trade secrets. Defendants' PARAD-ICE business is operating at the same location as the former I-CE-NY franchise and likely soliciting the same customers, who may not even realize that the Shop is no longer affiliated with ICENY. They are thus exploiting the goodwill of ICENY. As in *Ledo*, Defendants are also not merely unskilled workers. Rather they were trained by ICENY in how to make, produce, and market Thai ice cream rolls and were provided with secret recipes, and Defendants are continuing to use these proprietary techniques and information. Indeed, the ICENY investigator observed a PARAD-ICE employee at the Shop using ICENY's "anti-griddle" process to create Thai ice cream rolls. *See* McLaughlin Decl. ¶ 9, ECF No. 26.

Under these circumstances, the Court finds that the Non-Competition Clause is likely enforceable as to the operation of "the type of business that Defendants operated as a former franchisee." *Ledo*, 983 F. Supp. 2d at 642. In *Ledo*, the court found the franchisor likely to succeed on the merits of its claim that its non-competition clause was enforceable where it prohibited operating any restaurant within 10 miles of the franchisor's pizza franchises. *Id.* Similarly, the Court finds that ICENY is likely to succeed on its claim that the Non-Competition Clause can be enforced to bar the operation of a business that sells Thai ice cream rolls, other forms of frozen desserts, or other items constituting more than 15 percent of sales at I-CE-NY shops, at the Shop itself or within a five-mile radius. *See id.*; *NaturaLawn*, 484 F. Supp. 2d at 400 (finding reasonable the scope of non-competition provisions prohibiting the defendants from operating the same type of lawn care business they ran as franchisees, within the same geographic area they covered when the franchise agreement was in effect).

At this point, however, the Court is not prepared to conclude that the part of the Non-Competition Clause that would bar the operation of any dessert business is likely enforceable. A business selling "as a core menu item . . . cakes, pies, smoothies, shakes, [and] specialty beverages," Franchise Agreement ¶ 15.2.2.1, is sufficiently distinct from ICENY's Thai ice cream roll business that enforcing the Non-Competition Clause in its entirety would likely serve to protect more than ICENY's trade secrets, goodwill, and customer base and would instead simply restrict competition and impose undue hardship on Defendants. *See Becker*, 299 A.2d at 840 (noting the distinction drawn by Maryland courts between restraints which are justified and those which work undue hardship and are unenforceable because they merely seek to prohibit more efficient competition). Because the Court may excise overbroad language and enforce the remaining language, the Court finds that ICENY has established a likelihood of success on the merits of its

breach of contract claim relating to the Non-Competition Clause, as limited. *See Tawney v. Mut. Sys. of Md.*, 47 A.2d 372, 379 (Md. 1946); *Deutsche Post Glob. Mail, Ltd.*, 116 F. App'x 435, 439 (4th Cir. 2004) (stating that an overbroad restrictive covenant may still be preserved and made enforceable by excising, or "blue penciling," the unreasonable language where the offending provision is neatly severable).

## IV.    Irreparable Harm

Having found a likelihood of success on the merits of ICENY's claims, the Court will evaluate the remaining *Winter* factors.  On the second prong, movants must show that they are "likely to be irreparably harmed," not just that they face a mere possibility of harm. *United States v. South Carolina*, 720 F.3d 518, 533 (4th Cir. 2013).  The "irreparable harm" to be suffered must be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989)).

In trademark infringement cases, "a presumption of irreparable injury is generally applied once the [movant] has demonstrated a likelihood of confusion" because of the inherent injury to goodwill and the reputation of the moving party. *Scotts Co. v. United Industries Corp.*, 315 F. 3d 264, 273 (4th Cir. 2002); *see NaturaLawn*, 484 F. Supp. 2d at 401; *Ledo*, 983 F. Supp. 2d at 639. As discussed above, the Court has found a likelihood of confusion. *See supra* part III.B.  Where, Defendants have not appeared to rebut this presumption, the irreparable harm prong is satisfied as to the need for a preliminary injunction to bar the use of ICENY's mark.

ICENY has also demonstrated a likelihood of irreparable harm in the absence of an injunction to enforce the terms of the Franchise Agreement, including the bar on post-termination use of the ICENY System and the Non-Competition Clause.  Courts have held that a former

25

franchisee's operation of the same or similar business following termination of a franchise agreement results in irreparable harm to the franchisor. *See Ledo*, 983 F. Supp. 2d at 642-43 (collecting cases). The irreparable harm inflicted by such a breach of a non-competition clause is similar to the irreparable harm to goodwill and reputation inflicted by trademark infringement, particularly when, as here, the breach of contract involves the unauthorized use of trade secrets or proprietary information. *NaturaLawn*, 484 F. Supp. 2d at 401; *see Ledo*, 983 F. Supp. 2d at 643 (finding that the irreparable harm from the violation of a non-competition provision consists of the inevitable damage to the franchisor's goodwill and reputation with its customers). Such a breach also imposes irreparable harm because it signals to other franchisees that their agreements can be violated without consequences. *Ledo*, 983 F. Supp. 2d at 643; *NaturaLawn*, 484 F. Supp. 2d at 402.

As discussed above, Defendants appear to be ignoring their post-termination obligations under the Franchise Agreement and directly competing with ICENY while using its proprietary ICENY System without consent. Undisputed declarations from ICENY's President describe a real concern that consumers will believe Defendants' current Thai ice cream roll business still has some affiliation with ICENY. ICENY has "no control over the nature and quality of the goods or service being offered," and this will make it very difficult for ICENY to continue to do business in Yuma, Arizona with another franchisee. Sutthisophaarporn Decl. ¶ 23, ECF No. 10-1; *see also* Second Sutthisophaarporn Decl. ¶ 5. The Court therefore finds that it is probable that ICENY's reputation and goodwill will be irreparably damaged if customers are dissatisfied but do not recognize that Defendants' business is no longer a member of ICENY's franchise network. *See Ledo*, 983 F. Supp. 2d at 643. Thus, ICENY has also satisfied the irreparable harm prong as to its breach of contract claims.

## V.   Balance of the Equities and the Public Interest

ICENY has also demonstrated that the balance of the equities tips in its favor and that an injunction is in the public interest.   Where ICENY has a valid trademark and proprietary recipes and methodology associated with its Thai rolled ice cream shops, and it sought to protect them through a franchise agreement, it has important interests in preventing the disclosure and use of its methods by a competing business.   In the absence of an injunction to prevent Defendants from continuing to use ICENY's mark and proprietary information, ICENY will likely suffer irreparable harm in that its mark and proprietary information, including its secret recipes, will continue to be co-opted by Defendants.   The customer base established through the ICENY System may be permanently lost to PARAD-ICE, as it could choose to patronize PARAD-ICE over any new I-CE-NY location eventually re-established in the area.   Even if PARAD-ICE fails, this same customer base may be lost to ICENY in the future because of a loss of goodwill arising from confusion over whether ICENY continues to operate the Shop.   Likewise, the lack of enforcement of the Non-Competition Clause to prevent Defendants' operation of PARAD-ICE at the Shop, or a comparable ice cream shop in the vicinity, will result in similar harm to ICENY.

Although Defendants would endure some harm if they are required to shut down PARAD-ICE or move it more than five miles away, such harms are, as other courts have observed, "self-inflicted" and a predictable consequence of "their own willful acts" of breaching their contractual agreements. *NaturaLawn*, 484 F. Supp. 2d at 402.   After only a few months of operating under the Franchise Agreement, Defendants chose to engage in an unauthorized switch to operating the business under its own brand without paying franchise fees and to co-opt the ICENY System for themselves.   Where Defendants freely accepted the restrictions on the use of the ICENY System and prohibition on establishing a competing business in exchange for the training opportunities

27

and financial benefits available under the Franchise Agreement, there is no unfairness in the enforcement of those requirements. *See Merry Maids*, 33 F. Supp. 2d at 445. Significantly, the fact that Defendants are now violating the TRO by continuing to operate PARAD-ICE further tips the equities against them.

For similar reasons, the public interest weights in favor of a preliminary injunction. The public has an interest in validating the interests of trademark owners and the proprietary nature of their trade secrets. *See NaturaLawn*, 484 F. Supp. 2d at 404. Moreover, one of the purposes of trademarks is "to protect purchasers from being misled as to the identity of the enterprise from which goods and services are obtained," which is precisely the harm threatened here. *AMP Inc., v. Foy*, 540 F.2d 1181, 1185 (4th Cir. 1976). The public interest also favors requiring parties to abide by the legitimate terms of their contracts, if not unreasonable. *See NaturaLawn*, 484 F. Supp. 2d at 404 ("It is in the public interest to . . . enforce valid contracts"). Finally, the public has a strong interest in requiring compliance with court orders such as the TRO that Pico is currently violating, apparently with impunity. Accordingly, both the balance of the equities and the public interest favor a preliminary injunction.

## VI.    Injunctive Relief

As discussed above, ICENY has established all four *Winter* factors and thus has demonstrated that it is entitled to preliminary injunctive relief on its trademark infringement, unfair competition, and breach of contract claims. The TRO issued on September 6, 2019 shall be converted to a preliminary injunction as to Pico, with the modifications identified above. The preliminary injunction will bar Pico, Pico's agents and employees, and all "other persons who are in active concert and participation" with them from:

28

1. Operating, maintaining, engaging in, granting a franchise to, or having any interest in any business offering ice cream, frozen desserts, or any menu item that constitutes 15% of sales at I-CE-NY shops at or within a five-mile radius of 1929 E. 16th Street, Suite SB-7, Yuma, Arizona, 85366, or any presently existing I-CE-NY shop;

2. Continuing to use or display the registered mark, I-CE-NY, or any marks confusingly similar to it, in any manner, including without limitation on social media, as well as on cups, signs, furniture, fixtures, equipment, décor, advertising materials, stationery, and forms;

3. Violating the post-termination obligations under the Franchise Agreement between the parties, including by using or disclosing any confidential or proprietary methods, processes, or recipes obtained from ICENY pursuant to the Franchise Agreement; and

4. Continuing to use or display any slogans, tag lines, artwork, photographs, décor, or other intellectual property provided by ICENY or used in conjunction with Defendants' former I-CE-NY franchise.

## VII. Bond

Under Federal Rule of Civil Procedure 65, a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). This rule "is mandatory and unambiguous," and "failure to require a bond upon issuing injunctive relief is reversible error." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999). In order to ensure that there are funds to compensate Defendants

should they successfully establish that the preliminary injunction should not have issued and that they wrongfully sustained damages as a result of the injunction, the Court will order that ICENY post a bond of $2,000. ICENY's previously posted bond of $2,000 for the TRO will be accepted as the bond for the preliminary injunction. The preliminary injunction will therefore take effect upon the entry of the accompanying Order.

## CONCLUSION

For the foregoing reasons, ICENY's Motion for a Preliminary Injunction, ECF No. 10, is GRANTED IN PART and DENIED IN PART. The Motion is GRANTED in that the TRO entered on September 6, 2019 shall be converted to a preliminary injunction against Pico only, with the modifications identified in the accompanying Order. The Motion is DENIED WITHOUT PREJUDICE as to ICENY's request for a preliminary injunction against the remaining Defendants and for an order barring the enforcement of the Non-Competition Clause as to a dessert business not selling Thai rolled ice cream or other forms of ice cream or frozen desserts. A separate Order shall issue.

Date:  October 10, 2019

THEODORE D. CHUANG
United States District Judge